# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1926 | **DATE** | January 20, 2004 |
| **CASE TITLE** | *Trustmark Insurance Co. v. General Cologne Life Re of America* | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum and Order, the Court DENIES Cologne's Amended and Restated Motion for Judgment as a Matter of Law [89-1, 92-1].

(11) ☐ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | JAN 22 2004 date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| RTS | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TRUSTMARK INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | Hon. Blanche M. Manning |
| | ) | |
| v. | ) | 00 C 1926 |
| | ) | |
| GENERAL COLOGNE LIFE RE | ) | DOCKETED |
| OF AMERICA, | ) | JAN 2 2 2004 |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiff Trustmark Insurance Company ("Trustmark") brought the instant action seeking: (1) a declaratory judgment that Defendant General Cologne Life Reinsurance of America ("Cologne") is obligated under an alleged joint venture agreement that it made with Trustmark to reinsure a block of individual disability insurance ("IDI Policies")[1] (Count I); (2) specific performance under the alleged agreement (Count II); (3) damages for breach of contract (Count III); (4) damages for breach of fiduciary duty (Count IV); and (5) damages for promissory estoppel (Count V). After extensive discovery and briefing, this Court GRANTED Cologne's Motion for Summary Judgment as to Counts I-IV but DENIED the motion as to Count V (promissory estoppel).

After a bench trial on the promissory estoppel claim, Cologne brought the present Amended and Restated Motion for Judgment as a Matter of Law, pursuant to Federal Rule of Civil Procedure 52. For the reasons set forth herein, the Court DENIES this motion.

---

1     IDI policies insure employees from the risk that they might become injured or sick and not be able to continue with their employment. If an employee becomes disabled, the IDI policy provides the employee with income while the employee is unable to work.

## BACKGROUND [2]

From 1998 to 1999, Trustmark and Cologne investigated the possibility of reinsuring various blocks of IDI policies.[3] In researching the potential purchase of IDI blocks, Cologne and Trustmark did not codify their intentions in a single document. During the course of investigating various IDI blocks, Trustmark, Cologne, and John Hewitt & Associates ("JHA"), a subsidiary of Cologne, performed due diligence on a block of 7,000 IDI policies underwritten by Hartford Life Insurance Company ("Hartford") ("the Hartford Block"). On October 28, 1998, after conducting due diligence on the Hartford Block, Trustmark signed a Letter of Intent with Hartford to acquire the IDI block ("the Letter of Intent" or "Letter"). Cologne, however, did not sign, nor was mentioned, in the Letter of Intent.

Trustmark contends that it only executed the Letter of Intent after Cologne reviewed the Letter and agreed to share in the risk of reinsuring the Hartford Block. Without Cologne's approval, Trustmark alleges that it would never have entered into the Letter of Intent. Cologne, on the other hand, denies that it agreed to participate in reinsuring the Hartford Block.

The Letter of Intent stated that "time is of the essence" and that the Final Purchase Agreement for the Hartford Block ("the Final Purchase Agreement") would be executed no later than December 1, 1998, "unless a later date is mutually agreed upon." The Final Purchase

---

2   Because this Court has throughly discussed the facts of this case in its prior Memorandum and Opinion, the Court will only discuss the facts as they relate to the instant motion.

3   A reinsurance agreement is an agreement whereby a reinsurer agrees to indemnify an insurance company for payments owed by the insurance company on a block of defined insurance policies which the insurance company has underwritten. In exchange for indemnifying the insurance company, the reinsurer receives a portion of the premiums paid on the policies.

Agreement, however, was not signed until December 28, 1999. Like the Letter of Intent, Cologne did not sign, nor was it mentioned, in the Final Purchase Agreement.

Prior to the execution of the Final Purchase Agreement, on September 3, 1999, however, Cologne informed Trustmark that it was no longer interested in sharing in the risk on the Hartford Block.

Although Cologne had disavowed any interest in reinsuring the Hartford Block and Trustmark was facing significant losses, Trustmark contends that it was bound to enter into the Final Purchase Agreement by the Letter of Intent. Cologne, on the other hand, contends that by December 1999, Trustmark was no longer bound by the Letter of Intent. Cologne asserts that the Final Purchase Agreement contained materially different terms from the Letter of Intent. Trustmark contests this assertion, and contends that any differences in the terms were slight and at most constitute a minor variance from the terms in the Letter of Intent.

After Cologne refused to accept any liability on the Hartford Block, Trustmark brought the instant action. After extensive discovery and briefing, this Court GRANTED Cologne's Motion for Summary Judgment as to Counts I-IV but DENIED the motion as to the promissory estoppel claim (Count V). In ruling on this motion, this Court found that because Trustmark failed to present sufficient evidence that Trustmark and Cologne shared the requisite joint control, no joint venture exists as a matter of law, and therefore, summary judgment was appropriate as to Counts I-IV of Trustmark's Complaint because these counts were based on the existence of an alleged joint venture. In denying the motion as to the promissory estoppel claim, this Court found that there was a genuine material question of fact as to whether Trustmark

reasonably relied on an unambiguous promise to its detriment.[4]

After a bench trial on the promissory estoppel claim, Cologne brought the instant motion seeking a judgment as a matter of law, pursuant to Rule 52.[5]

## ANALYSIS

Cologne contends that it is entitled to a judgment as a matter of law because Trustmark has failed to establish: (1) the elements of its promissory estoppel claim; and (2) that it is entitled to invoke the partial performance exception to the statute of frauds. The Court will address each of these contentions in turn.

### I. Promissory Estoppel

To prevail on its promissory estoppel claim, Trustmark must show: (A) an "unambiguous promise" by Cologne to Trustmark to reinsure the Hartford Block; (B) Trustmark relied on the promise in entering into the Letter of Intent with Hartford; (C) Trustmark's reliance was "expected and foreseeable" by Cologne; and (D) Trustmark actually relied on the promise to their detriment. Cohabaco Cigar Co. v. United States Tobacco Co., 1999 WL 988805, at *10 (N.D. Ill. Oct. 22, 1999); Hall v. Nat'l Collegiate Athletic Assoc., 985 F. Supp. 782, 796 (N.D. Ill. 1997).

---

4    In denying the motion as to the promissory estoppel claim, this Court found that the doctrine of partial performance precluded Cologne from asserting the statute of frauds to bar the promissory estoppel claim.

5    Rule 52 provides that: "[i]f during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue." Under Rule 52, the Court may weigh the evidence to determine whether a party has established its claim. Collins v. Ralston Purina Co., 147 F.3d 592, 599 (7th Cir. 1998).

Cologne contends that Trustmark has failed to establish that: (A) Cologne made an "unambiguous promise" to reinsure 50% of the Hartford Block; and (B) even if such a promise was made, Trustmark relied on it to its detriment. The Court will address each of these contentions in turn.

### A. Unambiguous Promise

Although an "unambiguous promise" is required to prevail on a claim for promissory estoppel, "an express promise is not required." Falk v. U.H.H. Home Servs. Corp., 835 F. Supp. 1078, 1080 (N.D. Ill. 1993) (citing First Nat'l Bank v. Sylvester, 554 N.E.2d 1063, 1070 (Ill. App. Ct. 1990). Rather, the unambiguous promise may be "inferred from conduct and words" and the defendant's "past practice[s]." Id. In determining whether the promise was unambiguous, the court should examine the "intent of the promisor" to determine whether a reasonable person would have concluded that the defendant's actions constituted "a commitment" to "be bound." See Major Mat. Co. v. Monsanto Co., 969 F.2d 579, 583 (7th Cir. 1992). See also 31 C.J.S. Estoppel and Waiver § 93 (2003) ("a promise is a manifestation of intent by the promisor to be bound and is to be judged by an objective standard").

Furthermore, in determining whether a promise is "unambiguous," the party seeking to enforce the promise must specifically identify the "source of [the] promise." Hall, 985 F. Supp. at 796. The failure to point to the source of the alleged promise results in a finding that the promise is ambiguous. Id. Moreover, a promise by a party "simply to invest is ambiguous and cannot be reasonably relied upon if the promisee is unaware of the terms of the investment." Stuart Park Assoc. Ltd. Partnership v. Ameritech Pension Trust, 846 F. Supp. 701, 712 (N.D. Ill. 1994).

Although neither party here has cited, and this Court has not found, any decisions regarding promises with respect to sharing the risk in reinsurance, a number of courts have examined what constitutes an unambiguous promise in cases involving a lender and a borrower. For example, in Sylvester, 554 N.E.2d at 1070, in reversing the trial court's grant of summary judgment, the Illinois Appellate Court held that the plaintiff put forth sufficient facts to support a claim for promissory estoppel against a bank, which withdrew the plaintiff's line of credit. The plaintiff agreed to move its accounts to the bank after the bank stated that it "would be no problem" for the plaintiff to open a $600,000 line of credit. Id. at 1066. Although "[t]here was no agreement as to the length of time the line of credit would be extended," for the next six years, the plaintiff borrowed over $1,000,000 on a revolving basis and was told that it was a valued customer. Id. at 1067. Based on its long-standing line of credit with the bank, the plaintiff entered into a contract with a third-party intending to use the line of credit for payment. Id. After the bank unexpectedly cancelled the line of credit, the plaintiff was forced to default on the contract with the third party. Id. at 1067-68. In reversing the trial court, the Illinois Appellate Court held that based on the bank's past actions and assurances, a trier of fact could find that a reasonable person would have believed that the bank intended to be bound and thus had made an unambiguous promise.[6] Id. at 1070.

Here, Trustmark presented several witnesses who worked on the Hartford transaction and testified that, although they could not recall the specific details from any conversations, they

---

[6] A number of courts from other states have held that by putting a portion of a loan into reserve for a specific payee, it is reasonable for the payee to believe that the bank manifested its intent to set aside the reserves to that payee. See, e.g., Mallery Lumber Co. v. B&F Assocs., Inc., 440 A.2d 579, 580-84 (Pa. Supt. Ct. 1982); Fretz Constr. Co. v. Southern Nat'l Bank, 626 S.W.2d 478, 482-85 (Tx. 1981).

believed that Cologne intended to insure 50% of the risk on the Hartford Block. Therefore, the question is whether a reasonable person would have believed this to be true based on Cologne's words and actions.

After carefully reviewing the trial transcript and exhibits, this Court finds that, based on Cologne's words and conduct, it communicated to Trustmark an intent to share in 50% of the risk on the Hartford Block and that it was reasonable for Trustmark to believe this to be accurate. This decision is based in large part on the testimony of Andrew Perkins, a senior vice-president at Cologne, who worked closely with Trustmark in evaluating the Hartford Block and had the authority to bind Cologne in such a deal. Although Perkins testified that he never explicitly promised that Cologne would reinsure half of the Hartford Block, his words and actions could have led a reasonable person to conclude otherwise. For example, Perkins testified that Cologne: (1) was "interested in" and "agreed to jointly pursue the [Hartford Block] with Trustmark"; (2) established a $2 million reserve for the purpose of paying claims from the Hartford Block; (3) reviewed drafts of the Letter of Intent and opined that they were "acceptable"; (4) at the time the Letter of Intent was executed, "expected that Trustmark would cede 50% of the business" to Cologne; and (5) did not sign a reinsurance agreement with Trustmark at the time of the Letter of Intent because both parties thought that "it was best to wait until the documents were signed with Hartford." With regard to the establishment of the $2 million reserve, at least one witness testified that based on the law and industry custom and practice, there would have been no reason to establish the reserve unless Cologne had intended to reinsure the Hartford Block.

Additionally, Perkins testified about a meeting between Mr. Magsig, Perkins's boss and president of Cologne, and the CEO and president of Trustmark, around the time the Letter of

7

Intent "was being finalized." In connection with this meeting, Magsig prepared a "visit report" (Pl's Ex. 17), summarizing this meeting and stating that Cologne "was very pleased that the Hartford disability transaction in which we are jointly purchasing Hartford's closed block of individual DI business is nearly closed." Perkins testified that he read this report but never told Magsig that anything in the report was incorrect. The fact Perkins never told his boss and the CEO of Cologne that there was not a deal to take 50% of the risk of the Hartford Block, is strong evidence that Cologne did indeed intend to take such a risk.

Similarly, after the execution of the Letter of Intent, Perkins received a letter from Koloms of Trustmark stating that "since 1997, Trustmark has had an agreement with Cologne that the two companies would join forces with regard to any individual disability assumption reinsurance opportunity reaching the attention of either party" and "would evenly split the insurance risk on any such block with Trustmark providing the administrative capabilities." Despite the fact that he now states that there was never any promise by Cologne to split the reinsurance risk with Trustmark, Perkins never told Trustmark otherwise.

Moreover, on December 30, 1998, after the Letter of Intent was completed, Perkins wrote a letter to Lincoln National, seeking to purchase a block of policies. (Pl's Ex. 24.) In this letter, Perkins stated that "[s]ince 1997, Cologne and Trustmark have been working jointly in pursuit of non-cancellable disability opportunities and were successful partners in the aforementioned Hartford acquisition." Although Perkins testified that he did not mean to imply that Cologne and Trustmark had a legally binding partnership, this letter certainly demonstrates that even after the Letter of Intent was executed, Cologne still intended to share in 50% of the risk in the Hartford Block.

8

Additionally, the testimony and exhibits show that Perkins reviewed multiple drafts of the Letter of Intent and told Trustmark that the final Letter of Intent was acceptable. Moreover, on February 23, 1999, after verbally signing off on the Letter of Intent and reviewing a draft of the Final Purchase Agreement, Perkins wrote on the draft that "[w]e'll end up with a retro from Trustmark following this agreement." (Pl's Ex. 32.) Obviously, if Cologne had not intended to reinsure 50% of the Hartford Block, Perkins would not have believed that Cologne would receive a retroactive payment from Trustmark after it executed the Final Purchase Agreement.

Additionally, JHA, which is affiliated with Cologne, performed the due diligence on the Hartford Block. Mr. Demarco, who was in charge of due diligence on the Hartford Block for JHA, testified that he believed that in February of 1999, "Cologne and Trustmark had been successful partners in the acquisition of the Hartford Block."

Accordingly, this Court finds that Trustmark has established that Cologne intended to share in a specific percentage of the risk on the Hartford Block, and thus made an unambiguous promise to be bound.

### B. Detrimental Reliance

Detrimental reliance can consist of "any act which occasioned [the promisee] the slightest trouble or inconvenience." See, e.g., FH Prince & Co., Inc. v. Towers Fin. Corp., 656 N.E.2d 142, 147 (Ill. 1995). In determining detrimental reliance, the court must look at the individual facts of each case, Chicago Limousine Service, Inc. v. City of Chicago, 781 N.E.2d 421, 422 (Ill. App. Ct. 2002), to determine if enforcing the promise is the only way that the detriment can be avoided. See People v. Fako, 726 N.E.2d 734, 735-36 (Ill. App. Ct. 2000).

Whether Trustmark detrimentally relied on Cologne's promise hinges upon whether the

Letter of Intent bound Trustmark to enter into the Final Purchase Agreement. If Trustmark was required to enter the Final Purchase Agreement, then it can be concluded that Trustmark relied on Cologne's promise to its detriment. If, however, Trustmark executed the Final Purchase Agreement, on its own accord, without being required to do so by the Letter of Intent, then Trustmark cannot prove that it detrimentally relied on Cologne's promise.

Cologne contends that Trustmark was not required to enter into the Final Purchase Agreement because: (1) the Letter of Intent was contingent upon the Final Purchase Agreement; (2) even if the Letter of Intent was binding, the Final Purchase Agreement materially varied from the Letter of Intent. The Court will examine each of these contentions to determine whether the Letter of Intent legally bound Trustmark to enter into the Final Purchase Agreement.

Letters of intent are often used in sophisticated business transactions to memorialize a basic agreement and to efficiently "flush out any potential deal-breaking issues early in the negotiating process." SH008 ALI-ABA 387, Letters of Intent (2003). To determine if a letter of intent is a legally enforceable agreement, courts examine whether the parties intended to be bound by the letter of intent. Quake Constr., Inc. v. American Airlines, Inc., 565 N.E.2d 990, 994, 996-97 (Ill. 1990). In analyzing the parties' intent, the court must first examine the contract as a whole, and may only examine parole evidence if the language in the letter of intent is ambiguous or open to more than one interpretation with respect to the parties' intent to be bound. Id. at 994.

In examining the language, if the letter of intent contains a "condition precedent" requiring a formal agreement to be signed before the parties are obligated to perform, then even if all the terms of the contract are set forth in the letter of intent, it does not constitute a binding

legal agreement. Id. at 993-94. See also Magnus v. Lutheran Gen. Health Care Sys. v. Parkside Dev. Corp., 601 N.E.2d 907, 913 (Ill. App. Ct. 1992). If, however, there is only a "mere reference to a future contract," the letter of intent may still be binding, particularly if the future contract "is to be substantially based on the [] terms" of the letter of intent. Magnus, 601 N.E.2d at 913.

In cases where courts have found that the letter of intent was not binding, the letters of intent contained specific language conditioning any agreement upon a future execution of a formal agreement. For example, in Magnus, 601 N.E.2d at 912, the letter of intent stated that "[e]ach party's obligations hereunder are subject to and contingent upon the execution of the Purchase Agreement." The court held that this language "was unambiguous, indicating as a matter of law that no contract came into existence until the subsequent document was executed." Id. at 913. Likewise, in Interway, Inc. v. Alagna, 407 N.E.2d 615, 616 (Ill. App. Ct. 1980), the court found that a letter of intent was not a binding agreement because it contained the following wording: "[o]ur purchase is subject to a definitive Purchase and Sale contract to be executed." The court found that the term "subject to" showed as a matter of law that the parties did not intend for the letter of intent to be binding. Id.

Here, while the Letter of Intent does mention the subsequent drafting of the Final Purchase Agreement, it does not contain any explicit language stating that the parties' obligations are "subject to" or "contingent upon" the execution any subsequent agreement.[7] In fact, the

---

7    Trustmark contends that under Illinois law, paragraph 12 of the Letter of Intent should be construed as making the letter subject to or contingent upon the execution of a subsequent agreement. Paragraph 12 states in pertinent part that: "[d]uring the period from the date of this letter until the execution of the Agreement[s] (or the expiration of this letter if no Agreement[s] have been entered into), Sellers shall cause its [employees]" to allow

11

Letter of Intent states that "[o]nce accepted, this letter shall be binding, in accordance with its terms, upon the parties hereto." (Pl's Ex. 77.) Accordingly, this Court will look outside the four corners of the Letter of Intent to determine whether the parties intended to be bound by the letter of intent.

Looking outside the letter of intent to determine if the parties intended it to be binding, courts examine whether the agreement: (1) is of "the type [that] is usually put into writing"; (2) "contains many or few details"; (3) "involves a large or small amount of money"; and (4) "requires a formal writing for the full expression of the covenants." Quake Constr., Inc., 565 N.E.2d at 994. Courts also examine "whether the negotiations indicated that a formal written document was contemplated at the completion of the negotiations." Id. Also of importance is whether a party undertakes an obligation prior to the execution of a formal contract which is governed by the terms of the letter of intent. Id. at 995.

Here, after carefully examining the trial testimony and exhibits, this Court finds that the Letter of Intent was binding. The testimony at trial revealed that letters of intent are generally entered into in reinsurance agreements before the parties enter into a final purchase agreement. The Letter of Intent itself contained the essential provisions which were included in the Final Purchase Agreement. The transaction involved a large amount of money – $20 million. Additionally, in anticipation of entering into the Final Purchase Agreement, Trustmark incurred substantial costs in having the Hartford Block evaluated and undertook extensive preparations in anticipation of handling the claims administration for the Hartford Block. Accordingly, this

---

Trustmark access to the relevant policies. The Court, however, finds that this language does not unambiguously state the parties' intent.

Court finds that the fact that Hartford and Trustmark intended to enter into the Final Purchase Agreement after executing the Letter of Intent does not negate the parties' obligations in the Letter of Intent.

Additionally, Cologne contends that Trustmark was not required to enter into the Final Purchase Agreement because: (1) the Final Purchase Agreement was not executed until over one year from the date set forth in the Letter of Intent; (2) Trustmark did not timely receive consent from the former reinsurers – Lincoln National or Swiss Re – for the assignment of existing reinsurance; and (3) the purchase price was renegotiated.

Before discussing these specific contentions, the Court will address the law regarding the parties' obligations and rights when finalizing an agreement based on a letter of intent. Contrary to Cologne's contention, parties to a letter of intent may leave "some matters" open "for future agreement." See A/S Apothekeres Laboratorium for Specialpraeparater v. I.M.C. Chem. Group, Inc., 873 F.2d 155, 157 (7th Cir. 1989) (applying Illinois law). Accord Liu v. Price Waterhouse LLP,1999 WL 1012456, at *4 (N.D. Ill. Oct. 19, 1999) ("A contract may be enforced even though some of the contract terms may be missing or left open"). Moreover, in negotiating open terms or changes in conditions set out in the letter of intent, courts may impose "a duty to negotiate in good faith." See A/S Apothekeres, 873 F.2d at 158. To determine if the parties have a duty to negotiate in good faith and the scope of such duty, the court must examine "the terms of the letter of intent itself." Id. "The obligation to negotiate in good faith has been generally described as preventing one party from, renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement." Id.

Here, although the parties have not specifically discussed whether Trustmark had a duty

13

to negotiate in good faith, it appears to this Court that such a duty existed. The Letter of Intent specifically states that "the [b]uyer shall use its best efforts to assume the Policies as soon as possible." (Def.'s Ex. 2, at ¶ 1.) In assuming the "Policies," Trustmark was required to have the then current reinsurers – Lincoln National or Swiss Re – transfer all current reinsurance policies. (Id. at ¶ 14.) Accordingly, this Court finds that the Letter of Intent imposed a duty on Trustmark to negotiate in good faith to assume the underlying policies as soon as possible.

Applying the duty to negotiate in good faith, this Court finds that if Trustmark would have refused to execute the Final Purchase Agreement, it faced a real possibility of an action for breach of this duty and possibly for breach of the Letter of Intent. As required by the Letter of Intent, Trustmark had to negotiate for the assignment of existing reinsurance policies from Lincoln National and Swiss Re. The fact that Trustmark had to make certain concessions to receive these assignments does not appear to this Court to be grounds for Trustmark to have pulled out of the Final Purchase Agreement. Likewise, the fact that Trustmark renegotiated a slight reduction in the purchase price from the Letter of Intent does not appear to be material. As for the delay in executing the Final Purchase Agreement, this appears to have been partly the result of Trustmark undertaking its duty to negotiate in good faith to resolve the above two issues. Moreover, because both parties mutually agreed to waive the signing date, which was permitted under the Letter of Intent (Def.'s Ex. 2, at ¶ 15), the fact the Final Purchase Agreement was executed at a latter date does not appear to have been a breach of the Letter of Intent. Accordingly, based on these considerations, this Court agrees with the opinion of Trustmark's in-house attorney that Trustmark would have likely faced a civil suit if it had pulled out of the deal.

Moreover, this Court notes that on February 23, 1999, Cologne reviewed a draft of the

Final Purchase Agreement and did not voice any objections to the issues it now contends were grounds for Trustmark to terminate negotiations. Indeed, after reviewing a draft of the Final Purchase Agreement, Cologne's Perkins wrote on the draft that "[w]e'll end up with a retro from Trustmark following this agreement." (Pl's Ex. 32.)

Accordingly, this Court rejects Cologne's contention that Trustmark was not required to enter into the Final Purchase Agreement because it did not comply with the terms of the Letter of Intent and finds that Trustmark has established that it relied on Cologne's promise to share in the risk of reinsuring the Hartford Block to its detriment.

## II. Partial Performance Exception to the Statute of Frauds

Cologne also contends that Trustmark has not established that the partial performance exception bars Cologne from asserting the statute of frauds. In a prior Memorandum and Order, this Court held that "[t]o take a contract out of the statute of frauds under the partial performance exception, the party seeking enforcement of the alleged contract must show that the acts alleged as partial performance were "attributable exclusively to the contract." 2001 WL 1268539, at *12. In finding that there was a question of fact as to whether the partial performance exception applied, this Court noted "that if the evidence at trial shows that Trustmark entered into the Letter of Intent with the intention of insuring 100% of the block itself, then the partial performance exception will not preclude the operation of the statute of frauds. Id. at 21, n.5.

Cologne now contends that the partial performance exception does not apply because the evidence at trial failed to show that Trustmark's execution of the Letter of Intent "was attributable exclusively to an alleged agreement with Cologne. According to Cologne, the evidence at trial shows that: (1) Trustmark's signing of the letter of intent was not required by its

15

agreement with Cologne; and (2) Trustmark would have pursued the transaction regardless of Cologne's participation.

The Court finds each of these contentions unavailing. As explained above, the evidence at trial showed that Trustmark executed the Letter of Intent as part of its agreement with Cologne in splitting the risk on the Hartford Block. Likewise, after reviewing the evidence, this Court finds that although Trustmark employees did testify that Trustmark "could have" completed the transaction on its own, without Cologne, they would not executed the Letter of Intent without believing that Cologne intended to share 50% of the risk. Consequently, this Court finds that the evidence at trial does not show that Trustmark entered into the Letter of Intent with the intention of insuring 100% of the block itself, and therefore, the partial performance exception to the statute of frauds precludes Cologne from asserting the statute of frauds as to the claim for promissory estoppel.

## CONCLUSION

For the foregoing reasons, the Court DENIES Cologne's Amended and Restated Motion for Judgment as a Matter of Law [89-1, 92-1].

**ENTER:**

*Blanche M. Manning*
**BLANCHE M. MANNING**
**U.S. DISTRICT COURT JUDGE**

**DATE:** 1-20-04

trustmarkMJML.wpd					17